## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY J. HUGHES,                    :
                                       :
              Plaintiff                :      No. 4:10-CV-2574
                                       :
       v.                              :      (Judge Nealon)
                                       :
MICHAEL J. ASTRUE,                     :
COMMISSIONER OF SOCIAL                 :
SECURITY,                              :
                                       :
              Defendant                :

**MEMORANDUM**

### BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jeffrey J. Hughes's claim for social security supplemental security income benefits.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Hughes, who was born in the United States on March 27, 1962, graduated from high school and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 29-30, 104 and 115.[1] Hughes has past relevant

---

1. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on October 7, 2010.

employment[2] as a car salesman which was described by a vocational expert as skilled, light work; as a general manager of a convenience store, described as skilled, light to medium work; a concrete/building materials salesman, described as semi-skilled, heavy work; and an owner/operator of a nightclub, described as skilled, medium work.[3] Tr. 47 and 870-871. Hughes's last job was

---

2. Past relevant employment in the present case means work performed by Hughes during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

3. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If

(continued...)

2

as a car salesman in 2001. Tr. 108 and 117.  Hughes has not worked since June 10, 2001. Tr. 108 and 116-117.

On January 7, 2008, Hughes protectively filed[4] an application for supplemental security income benefits. Tr. 104-107 and 111.  Hughes claims that he became disabled on June 10, 2001, because of mental and physical impairments. Tr. 31-32, 54, 104, 111, 115, 120, 127, 129, 131, 133, 136 and 142.  He identified anxiety, depression and decreased memory and concentration as his mental health impairments and neck, low back and leg pain, knee problems, seizures, chronic bronchitis, high cholesterol, lightheadedness and headaches as his physical impairments. Id. Hughes stated that he cannot sit, stand or walk for any extended period of time and that he frequently has to change positions. Id.

Hughes's alleged disability onset date of June 10, 2001, has no impact on Hughes's application for supplemental security

---

3.   (...continued)
        someone can do medium work, we determine that he or she
        can do sedentary and light work.

        (d) *Heavy work*.  Heavy work involves lifting no more
        than 100 pounds at a time with frequent lifting or
        carrying of objects weighing up to 50 pounds. If
        someone can do heavy work, we determine that he or she
        can also do medium, light, and sedentary work.

20 C.F.R. § 416.967.

4.   Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met." See C.F.R. § 416.501. Consequently, Hughes is not eligible for SSI benefits for any period prior to February 1, 2008.

On October 28, 2008, the Bureau of Disability Determination[5] denied Hughes's application. Tr. 54-58.  On November 12, 2008, Hughes requested an administrative hearing. Tr. 65-66. After about 13 months had passed, a hearing was held before an administrative law judge on December 7, 2009. Tr. 24-47. On January 25, 2010, the administrative law judge issued a decision denying Hughes's application. Tr. 9-20.  On February 16, 2010, Hughes filed a request for review with the Appeals Council. Tr. 48-49.  On October 27, 2010, the Appeals Council concluded that there was no basis upon which to grant Hughes's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Hughes then filed a complaint in this court on December 17, 2010.  Supporting and opposing briefs were submitted and the

---

5.   The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration. Tr. 55.

appeal[6] became ripe for disposition on August 5, 2011, when Hughes filed a reply brief.

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if

_____

6.   Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."   M.D.Pa. Local Rule 83.40.1.

supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to

resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims. <u>See</u> 20 C.F.R. § 416.920; <u>Poulos</u>, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[7] (2) has an impairment that is severe or a combination of impairments that is severe,[8] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[9] (4) has the

--------

7. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

8.     The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. <u>Id.</u>  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).

9. If the claimant has an impairment or combination of

(continued...)

residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

---

9.  (...continued)
impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

10.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Before we address the administrative law judge's decision
and the arguments of counsel, we will review some of Hughes's
medical records.

Two of the conditions that Hughes contends he suffers
from are degenerative disc disease[11] and radiculopathy.[12]   In

---

11.   Discogenic disease or degenerative disc disease is disease
or degeneration of the intervertebral discs.   The intervertebral
discs, the soft cushions between the 24 bony vertebral bodies,
have a tough outer layer and an inner core composed of a gelatin-
like substance, the nucleus pulposus. The outer layer of an
intervertebral disc is called the annulus fibrosus. A bulge
(protrusion) is where the annulus of the disc extends beyond the
perimeter of the vertebral bodies. A herniation is where the
nucleus pulposus goes beyond its normal boundary into the annulus
and presses the annulus outward or ruptures the annulus. Such
bulges(protrusions) and herniations if they contact nerve tissue
can cause pain.   Degenerative disc disease (discogenic disease)
has been described as follows:

> As we age, the water and protein content of the
> cartilage of the body changes. This change results in
> weaker, more fragile and thin cartilage. Because both
> the discs and the joints that stack the vertebrae
> (facet joints) are partly composed of cartilage, these
> areas are subject to wear and tear over time
> (degenerative changes). The gradual deterioration of
> the disc between the vertebrae is referred to as
> degenerative disc disease. . . Wear of the facet
> cartilage and the bony changes of the adjacent joint is
> referred to as degenerative facet joint disease or
> osteoarthritis of the spine. Trauma injury to the spine
> can also lead to degenerative disc disease.

> Degeneration of the disc is medically referred to as
> spondylosis. Spondylosis can be noted on x-ray tests or
> MRI scanning of the spine as a narrowing of the normal
> "disc space" between the adjacent vertebrae.

> Degeneration of the disc tissue makes the disc more
> susceptible to herniation. Degeneration of the disc can
> cause local pain in the affected area. Any level of the
> spine can be affected by disc degeneration. When disc
> degeneration affects the spine of the neck, it is
>                                      (continued...)

November, 2003, and April, 2004, while living in Florida, Hughes

was diagnosed as suffering from "chronic low back pain" and

"radiculitis"  by Raymond D. Dominick, M.D., a specialist in

---

11.   (...continued)
referred to as cervical disc disease. When the mid-back
is affected, the condition is referred to as thoracic
disc disease. Disc degeneration that affects the lumbar
spine can cause chronic low back pain (referred to as
lumbago) or irritation of a spinal nerve to cause pain
radiating down the leg (sciatica). Lumbago causes pain
localized to the low back and is common in older
people. Degenerative arthritis (osteoarthritis) of the
facet joints is also a cause of localized lumbar pain
that can be detected with plain x-ray testing is also
a cause of localized lumbar pain.  The pain
from degenerative disc disease of the spine is usually
treated conservatively with intermittent heat, rest,
rehabilitative exercises, and medications to relieve
pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and
Sciatica, MedicineNet.com, http://www.medicinenet.
com/degenerativedisc/page2.htm (Last accessed March 8, 2012).
Degenerative disc disease is considered part of the normal aging
process. Id.

12.  Radiculitis is "inflamation of the root of a spinal nerve,
especially of that portion of the root which lies between the
spinal cord and the intervertebral canal." Dorland's Illustrated
Medical Dictionary, 1405 (27th Ed. 1988). Radiculitis is
synonymous with radiculopathy which is "characterized by pain
which seems to radiate from the spine" to other parts of the
body, including the extremities. Radiculopathy is a condition
where one or more nerves or nerve roots are affected and do not
work properly. Radiculopathy is a result of disc herniation or an
injury causing foraminal impingement of an exiting nerve (the
narrowing of the channel through which a nerve root passes). See,
generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.
com/radiculopathy/article.htm (Last accessed March 8, 2012). A
herniated disc is one cause of radiculopathy. Id.  Radiculopathy
is a step beyond degenerative disc disease. Radiculopathy can
cause tingling, numbness and weakness in an extremity.

musculoskeletal disorders and chronic pain, located in Tavares, Florida. Tr. 273, 276-277 and 408.   Dr. Tavares opined that Hughes was unable to work because of "intractable pain."[13] Id.

In or about December, 2004, Hughes moved to Pennsylvania and commenced treating with Ireneusz Szulawski, M.D., an Internal Medicine specialist, located in Lewistown. Tr. 205.   Through January 7, 2008, the date Hughes filed his application for SSI, Hughes had fairly reg ular medical visits with either Dr. Szulawski, other physicians to which Hughes was referred by Dr. Szulawski, or at the emergency department at the Lewistown Hospital.   The majority of these appointments related to his ongoing complaints of back pain and the treatment provided was primarily narcotic pain medications.

On April 20, 2005, Hughes had an MRI of the lumbar spine performed at the Lewistown Hospital. Tr. 253 and 343. The MRI as interpreted by the radiologist Scott D. Marlowe, M.D., revealed a "[m]ild broad based [herniated nucleus pulposus] extending to the right at the L5-S1 level with mild associated mass affect on the

---

13.   There is only one treatment record from Dr. Dominick contained within the administrative record.   Tr. 273-274. However, from two documents entitled "Medical Verification Form to Be Completed by Licensed Physician" it is clear that Hughes was treated by Dr. Dominick during the years 2003 and 2004. Tr. 276-277. There is no indication that the administrative law judge took steps to obtain all of Hughes's treatment records from Dr. Dominick.

thecal sac.[14]   This does contact the right S1 nerve root sleeve and likely accounts for the patients radicular symptoms." Id.

In September, 2005, Hughes after falling down "20-carpeted steps" visited the emergency department at the Lewistown Hospital complaining of back pain. Tr. 228. A physical examination revealed a positive straight leg raise test on the right.[15] Id. The diagnostic impression was that Hughes had "exacerbated his chronic problem in his back." Tr. 229.

On October 9, 2006, Dr. Szulawski completed a document entitled "Pennsylvania Department of Public Welfare Employability Assessment Form" on behalf of Hughes. Tr. 157-158.   In that form Dr. Szulawski stated that Hughes "[h]as a physical or mental disability which permanently precludes any gainful employment. The patient is a candidate for Social Security Disability or SSI." Id. Dr. Szulawski further stated that the primary diagnosis was chronic

---

14.   The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

15.   The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.   The patient, either lying or sitting with the knee straight, has his or her leg lifted.   The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated-discs-straight-leg-raise (Last accessed March 9, 2012).

back pain and that his assessment was based upon physical examinations, review of medical records, clinical history,  and appropriate tests and diagnostic procedures. Id.

On October 30, 2006, Hughes was examined by Richard D. Allatt, M.D., at the request of Dr. Szulawski. Tr. 159-160.  A physical examination by Dr, Allatt revealed that Hughes had "an antalgic[16] gait with limping on his right leg" and "[h]is walking is slow, hesitant with an uneven cadence and rhythm." Tr. 160. Dr. Allat recommend a course of physical therapy. Id.

On March 22, 2007, Hughes visited the emergency department at the Lewistown Hospital complaining of low back pain and tingling in his right foot after falling "down some steps." Tr. 578. A physical examination revealed spasm and tenderness in the right lumbar paraspinous region. Id.  Hughes was prescribed pain medications. Tr. 579.  Two days later Hughes again visited the emergency department complaining of back pain. Tr. 574. A physical examination revealed "diffuse tenderness over his back" and positive straight leg raise tests. Id.  Hughes had decreased reflexes on the right. Id.  The assessment was that Hughes suffered from "[e]xacerbation of chronic back pain with lumbar radiculitis." Id.  Pain medications were prescribed. Tr. 575.

---

16.  Antalgic is defined as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary, 95 (27th Ed. 1988).

14

On March 28, 2007, Hughes visited the emergency department at the Lewistown Hospital after falling on his right side while walking at a Wal-Mart and falling a second time when he was climbing the steps at home. Tr. 569.  Hughes reported that "his right leg gave out." Id.  An MRI performed on April 3, 2007, revealed that in comparison to the April 20, 2005 MRI, there were "[s]table findings except perhaps minimally more prominent protrusion at the L2-3 level extending to the left[.]" Tr. 497.

On December 4, 2007, Hughes was involved in a motor vehicle accident. Tr. 356.  An x-ray of the cervical spine taken on December 17, 2007, revealed "[c]ervical spondylosis at C5-C6-C7 levels." Tr. 361.

On January 10, 2008, Hughes underwent right knee surgery to repair a torn medial meniscus. Tr. 358.  The knee surgery was successful. Tr. 352.

On June 2, 2008, Hughes was examined by Rodney W. Companion, RN-C, D.O., on behalf of the Bureau of Disability Determination. Tr. 399-407. In a report of this examination Dr. Companion described Hughes's gait as "[v]algus,[17] bipedal with limp." Tr. 402.  Hughes was able to sit 22 minutes with an unsupported back; he had moderate difficulty arising from a

---

17.  When knees have a "varus" alignment a person is considered bow-legged. In contrast when knees have a "valgus" alignment a person is considered knock-kneed.

"recumbent"[18] position to a siting position; he was able to get on and off the exam table with minimal difficulty; he dressed and undressed without difficulty; he had "[k]yphoscoliosis[19] right thoracic to left lumbar;" he had a tender anterior right lower leg; he had positive tests for a torn meniscus and ligament instability with respect to the right knee; he had peripheral vascular changes in the distal ½ of the lower legs; both of his arms had "peripheral vascular changes from wrists to periphery;" he had a negative straight leg raise test bilaterally; and he had normal deep tendon reflexes. Tr. 402-403.

Dr. Companion's impression was that Hughes suffered from a lumbar spine impairment and peripheral vascular disease. Tr. 403. Dr. Companion stated that the "[l]umbar spine and the neuropathy is obvious on physical examination[.]" Id. With respect to the peripheral vascular disease, Dr. Companion stated that "[s]ignificant physical findings were obvious during this physical examination." Id.

---

18. Recumbent is defined as "lying down." Dorland's Illustrated Medical Dictionary, 1436 (27th Ed. 1988).

19. Kyphoscoliosis, a combination of kyphosis and scoliosis, is defined as a "backward and lateral curvature of the thoracic spinal column[.]" Dorland's Illustrated Medical Dictionary, 886 (27th Ed. 1988). Kyphosis is defined as an "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side; hunchback." Id. Scoliosis is defined as "an appreciable lateral deviation in the normally straight vertical line of the spine." Id. at 1497.

Dr. Companion completed a range of motion chart which reveals that Hughes had significant impairment in his lumbar flexion-extension range of motion and mildly decreased flexion-extension range of motion of the right knee. Tr. 404-405.

Dr. Companion also completed a functional capacity assessment in which he concluded that Hughes had the ability to frequently lift and/or carry 20 pounds and occasionally 25 pounds. Tr. 406. Dr. Companion stated that Hughes could sit 8 hours in an 8-hour workday as long as he had a sit/stand option. Id. However, with respect to standing and walking, Dr. Companion did not indicate the number of hours that Hughes could stand and/or walk in an 8-hour workday but merely stated that Hughes would need a hand-held assistive device to balance and ambulate. Id. Dr. Companion indicated that Hughes could only occasionally bend, kneel, stoop, crouch, balance and climb. Tr. 407.

On June 15, 2008, Hughes visited the emergency department of Lewistown Hospital complaining of "[b]ack pain radiating down his right leg." Tr. 552. A physical examination revealed "[t]enderness on palpation of the lower back with pain on straight leg raising to 30 degrees, right greater than left." Id.

On July 22, 2008, a letter was sent to Hughes's attorney by Dr. Szulawski in which he reviewed his treatment of Hughes. Tr. 408-410. In that letter, Dr. Szulawski stated in relevant part as follows:

17

During my initial visit I did not appreciate any
significant abnormalities on the exam except there
was mild tenderness over the lumbar spine and paraspinal
areas.  There were no gross motor or sensory deficits
at that time.  I decided to continue the patient on
Methadone and OxyFast. During the subsequent visit in
March 2005, the patient confirmed stable chronic
symptoms.

*     *     *     *     *     *     *     *     *     *     *

Later in March 2005, he had an episode of exacerbation
of bilateral leg pain and reported more tingling. Again,
the neurological exam at that time did not reveal
significant abnormalities. Given his exacerbation, I
decided to refer the patient to a neurosurgeon, Dr.
Bruce Wilder, and I obtained an MRI of the lumbar spine
at that time. The MRI of 4/20/05 revealed degenerative
changes in the disc at L5-S1.

*     *     *     *     *     *     *     *     *     *     *

Throughout the time during which I cared for the
patient, he used his medication regularly, and I did
not find any episodes of request for early refills. The
core of his medication consisted of Methadone 40-50 mg
3 times a day throughout 2004 until the present with a
smaller amount of OxyFast and currently Norco 10/325mg
up to b.i.d.  He's also on other medications which may
affect pain modulation such as Trazodone and Celexa
although these were also used for depression.

In February 2006, the patient was seen in the emergency
room for questionable grand mal seizures, and he was
seen subsequently by a neurologist.  This was an
isolated episode. I do mention it since there were
no abnormalities on the neurological exam by the
specialist.

Subsequently the patient was also involved in a motor
vehicle accident, by his report on 5/19, and he was
seen by Dr. Raymond Nungesser on 6/13/06. . . [Hughes]
reported a neck injury at that time. X-ray of the neck
was obtained, and no fractures were identified. Patient
was treated with ibuprofen, heat and recovered.  There
were no significant findings other than tenderness in
the neck and some limitation of range of motion.

18

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

[Hughes] was suggested a course of physical therapy at HealthSouth.   However, he reported no benefit.

On 12/4/07, the patient had a motor vehicle accident after which he continued with neck pain and stiffness.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

Following the motor vehicle accident, the patient was seen primarily by orthopedic surgeon, Dr. DeVita, as the injuries also involved knee pain . . . .

The patient has had a follow-up visit with me in March 2008 . . . so I referred him to physical therapy. However, the patient did not complete the course. He stated that it caused exacerbation of the symptoms.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

During the evaluation of a physician assistant on 6/20/08, the patient was noted to have exacerbation of his sciatic pain on the right.   There was reported weakness and numbness to the right thigh and toes. . . His exam at that time showed normal deep tendon reflexes with patellar and ankles, limitation of flexion and positive straight leg raising of the right lower extremity at 45° and tenderness of the right lower back and buttocks.   At that appointment there was a limp noticed.   He was treated with Ketorolac[20] and prednisone taper.[21]

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

Given his history, I think it would be very difficult

---

20.   Ketorolac is a nonsteroidal anti-inflammatory drug "used short-term (5 days or less) to treat moderate to severe pain." Ketorolac, Drugs.com, http://www.drugs.com/mtm/ketorolac.html (Last accessed March 9, 2012).

21.   "Prednisone is in a class of drugs called corticosteroids. Prednisone prevents the release of substances in the body that cause inflammation." Prednisone, Drugs.com, http://www.drugs.com /prednisone.html (Last accessed March 9, 2012).

> for him to find an employer that would accommodate his
> medical conditions.
>
> Again, given his clinical course, I do not expect that
> he would recover within the next 12 months, and I expect
> that the patient will suffer future exacerbations which
> would probably compromise his chances of maintaining
> employment.

Id.   Dr. Szulawski referred Hughes to HealthSouth for a functional

capacity evaluation. Id.

The evaluation at HealthSouth was performed in late July,

2008, by occupational therapist David Boone. Tr. 412-420. The

evaluation lasted 3.5 hours and was performed over two days (July

30th and 31st). Id.   A physical examination performed as part of the

evaluation revealed that Hughes's "[g]ait pattern was guarded with

right antalgic gait noted." Tr. 415. Also, Hughes was found to have

decreased right shoulder range of motion and decreased strength and

range of motion in the bilateral lower extremities. Tr. 414.

The functional capacity evaluation revealed that Hughes

was "functioning in the sedentary category of work as defined by

the Dictionary of Occupational Titles." Tr. 412. Mr. Boone found

that Hughes retained the capacity to sit for 15 minutes at a time,

stand 5 minutes and walk 4 minutes; and Hughes could occasionally

lift 20 pounds from waist to shoulder, 0 pounds from shoulder to

overhead, and occasionally carry 15 pounds for a distance of 60

feet. Id.

20

With respect to the validity of the functional testing, Mr. Boone  stated that "[d]ynamometer testing revealed consistent effort on 16 out of 16 tests" and "[o]verall, Jeffrey Hughes provided a consistent effort during validity testing." Tr. 414. Mr. Boone further stated that "Hughes provided a fully reliable report of pain and physical ability, which matched objective findings and clinical observations" and that Hughes demonstrated a near full physical effort as indicated by, inter alia, visible perspiration, increased respiration rate, blanching of knuckles during grip strength testing, using tip toes to better access heights, nudging weights and items into place with chest and pulling items closer for improved access. Id.

On August 7, 2008, Dr. Szulawski completed a document entitled "Permanent Residual Functional Capacity Evaluation." Tr. 421.  In that document, Dr. Szulawski stated that Hughes could sit at one time 15 minutes and stand and/or walk 4 to 5 minutes during an 8-hour workday; he could sit for a total of 2 hours and stand and/or walk 1 hour during an 8-hour workday; he could occasionally lift and/or carry 20 pounds; and he could never bend, squat or climb. Tr. 421-422.

In a letter dated August 11, 2008, to Hughes's attorney, Dr. Szulawski stated as follows: "I have reviewed the recent functional capacity evaluation of Jeffrey Hughes from HealthSouth. I have also called the therapist to clarify the findings, and it

21

seems that, given his short period of tolerance of standing and sitting and the need to frequently change position, he wouldn't be a competitive employee even in the sedentary work category." Tr. 411.[22]

On September 25, 2008, Hughes was examined by Michael J. Murray, M.D., on behalf of the Bureau of Disability Determination. Tr. 423-429. Dr. Murray noted that Hughes "walked from the waiting area to the examination room approximately 100 feet using a halting gait" and "short stride with decreased arm swing." Tr. 426. Dr. Murray noted lack of movement in Hughes's neck, tenderness in the paraspinal muscles, severe pain with movement of the shoulders above the head, a positive straight leg raise test, +2 edema of the ankles, and very severely limited range of motion in the lower legs. Tr. 427-428. Dr. Murray stated that an MRI of Hughes's lower

---

22. The administrative law judge in his decision stated that he gave "little weight to Dr. Szulawski's opinion since the [functional] capacity assessment at HealthSouth seems to be of questionable validity in light of the claimant's refusal to perform many of the physical tasks necessary for full testing, despite the fact that the residual functional capacity assessment of HealthSouth indicated that the claimant can lift twenty pounds occasionally." Tr. 16-17. The administrative law judge had no basis to question the validity of the HealthSouth evaluation in light of the validity testing mentioned in the evaluation. The administrative law judge engages in inappropriate lay analysis of the HealthSouth evaluation when he stated that it was of questionable validity. No medical expert so stated. The administrative law judge appears to pick and choose and misconstrue items in that evaluation. Although the report indicated that Hughes could lift 20 pounds occasionally from waist to shoulder, it did not indicate that Hughes met the lifting/carrying requirements of full-time light work.

back revealed that "he has a herniated disc at the right L5-S1 area with impingement of the L5 on the nerve root sleeve that may be accounting for his severe pain . . . [and] it does appear that he is in pain." Tr. 428.  Dr. Murray also completed a statement of Hughes's ability to perform work-related physical activities. Tr. 431-430.  Of relevance to our disposition of this case is Dr. Murray's finding that Hughes required a sit/stand option and could never bend, kneel, stoop, crouch, or balance. Id.

On October 1, 2008, Dr. Szulawski issued a letter stating that "chronic back pain may prevent [Hughes] from being able to be tested in the supine position unless special accommodations for position are made available such as a recliner, etc." Tr. 432.

A February 19, 2009, lumbar MRI showed a subligamentous disc bulge at L5-S1 with a focal central disc protrusion and compromise of the right-sided neural foramina[23] with a widely patent left-sided neural foramina. Tr. 470.  At the L2-L3 level, there was minimal subligamentous disc bulge and mild right-sided posterior osteophyte [spur] formation compromising the right-sided neural

---

23.  The administrative law judge in his decision indicated that this MRI revealed "no evidence of nerve root impingement."  This is an inappropriate lay interpretation of the MRI. First, Dr. Murray indicated that "a herniated disc at the right L5-S1 area with impingement on L5 on the nerve root sleeve . . . may be accounting for his severe pain[.]" Tr. 428. Second, in 2004 Dr. Dominick indicated that Hughes was suffering from radiculitis. Tr. 276. Third, the fact that the neural foramina was compromised by a disc protrusion is circumstantial evidence that the exiting nerve root was impinged.

foramina. Id.  At L4-L5, there was mild focal central disc
protrusion and mild to moderate spinal canal stenosis without
significant compromise of the neural foramina. Id.  The finding at
L5-S1 was characterized as a new finding. Id.

Hughes visited the emergency department on multiple
occasions between mid-March and the end of May, 2009, complaining
of back pain.

On March 21, 2009, Hughes visited the emergency
department at the Lewistown Hospital after sustaining a fall. Tr.
526-527.  A physical examination revealed that Hughes could not
assume a supine position because of pain. Tr. 527.  Hughes's deep
tendon reflexes in the lower extremities were diminished and he had
a positive straight leg raise test. Tr. 527-528.  The assessment
was that Hughes suffered, inter alia, from lumbar radiculopathy.
Id.

During a visit to the emergency department on May 30,
2009, a physical examination revealed that Hughes had decreased
range of motion of the lumbar spine with diffuse tenderness of the
paravertebral musculature. Tr. 515.  Also, Hughes had positive
straight leg raising tests bilaterally. Id.  At a visit on May 31,
2009, an emergency room physician noted decreased range of motion
of the back, mild diffuse tenderness, bilateral lower lumbar
paraspinous spasm, diminished deep tendon reflexes as well as an

inability to elicit ankle reflexes.[24] Tr. 511.  The differential
diagnosis by the examining physician was "chronic pain syndrome,
herniated disc, lumbar radiculopathy" and "[n]oncompliant with
outpatient pain medication management." Id.

On April 29, 2009, Jyotish Grover, M.D., a pain medicine
specialist, in Lewistown, noted that the MRI of February 19, 2009,
revealed a disc protrusion at the L5-S1 level with right sided
neuroforaminal stenosis and upon physical examination of Hughes
found limited lumbar range of motion in all planes and positive
straight leg raise tests. Tr. 601.  Dr. Grover's diagnosis was
lumbar disc displacement[25] and lumbar neuritis.[26] Id.

In a letter dated November 24, 2009, Dr. Szulawski
updated Hughes's situation since July, 2008. Tr. 617-618. Dr.
Szulawski noted that the MRI of February 19, 2009, revealed some
compromise of the right foramina and that in October, 2009, Hughes

---

24.  Absent ankle reflexes can be due to many different medical
conditions, including impingement of the S1 nerve root. See
Stephanie G. Wheeler, M.D., et al., Approach to the diagnosis and
evaluation of low back pain in adults, http://www.uptodate.com/
contents/approach-to-the-diagnosis-and-evaluation-of-low-back-pai
n-in-adults (Last accessed March 9, 2012).

25.  Lumbar disc displacement is a term used to described a disc
bulge (protrusion) or herniation.

26.  Neuritis is defined as "inflammation of a nerve, a condition
attended by pain and tenderness over the nerves, anesthesia,
paresthesias, paralysis, wasting, and disappearance of the
reflexes. In practice, the term is also used to denote
noninflammatory lesions of the peripheral nervous system."
Dorland's Illustrated Medical Dictionary, 1127 (27th Ed. 1988).

had additional knee surgery. Id. Dr. Szulawski further stated that
"his prognosis as to the back pain . . . ha[s] really not changed
since July 2008. I believe that he has chronic musculoskeletal back
pain, and given his frequent exacerbations, short tolerance of
standing and sitting, he wouldn't be a competitive employee. His
current physical capacity may be additionally compromised now by
his right knee exacerbation and recent surgery." Tr. 618.

**Discussion**

The administrative law judge went through each step of
the sequential evaluation process and (1) found that Hughes had
not engaged in substantial gainful activity since January 7, 2008,
the application date; (2) found that Hughes had the severe
impairments of "degenerative disc disease, status post knee
surgery and anxiety;" (3) found that Hughes had moderate
difficulties with regard to concentration, persistence or pace;
(4) found that Hughes's impairments did not meet or equal a listed
impairment; (5) found that Hughes lacked credibility; (6) rejected
the opinion of treating physician Szulawski; and (7) concluded
that Hughes could not perform his past relevant work but that he
could perform a limited range of light work. Tr. 16-19.
Specifically, the administrative law judge stated that Hughes
could engage in full-time light work as defined in the regulations

allowing sitting, standing, walking for six hours
in a normal workday. The claimant can do occasional
balancing, stooping, kneeling and crouching. The

26

> claimant cannot crawl or climb ropes or scaffolds. He
> cannot be exposed to unprotected machinery and he is
> limited to performing simple, repetitive tasks.

Tr. 13.   In so finding, the administrative law judge stated that

he gave "great weight to Dr. Murray's findings on the 'Medical

Source Statement of the Ability to Do Work-Related Activities

(Physical)' wherein he opined that the claimant is capable of

lifting and carrying up to twenty-five pounds with some postural

and environmental limitations." Tr. 16.   The administrative law

judge also stated that he gave weight to Dr. Companion's findings.

Id.

At step five of the sequential evaluation process, the

administrative law judge, based on a residual functional capacity

of a limited range of light work as described above and the

testimony of a vocational expert, found that Hughes had the ability

to perform work as a cashier, packer and tagger, and that there

were a significant number of such jobs in the regional economy. Tr.

19.

The administrative record in this case is 876[27] pages in

length and we have thoroughly reviewed that record.   Hughes argues,

inter alia, that the administrative law judge erred when he failed

to (1) properly consider and evaluate the medical evidence and (2)

---

27.   The original administrative record consisting of 849 pages
was filed on March 25, 2011 (Doc. 5) and a supplemental
administrative record was filed on May 16, 2011, consisting of an
additional 27 pages. (Doc. 8).

properly evaluate Hughes's subjective complaints. Those arguments have substantial merit. In addition to those errors, the administrative law judge erred at step two of the sequential evaluation process.  We will begin with that error.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then, when setting a claimant's residual functional capacity, considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.   If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.  However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity.  The social security regulations mandate such consideration and this court has

28

repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil
No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.);
Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa.
September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-
1265, slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo, J.);
20 C.F.R. §§ 416.923 and 416.945(a)(2).

The record indicates that in addition to degenerative
disc disease Hughes was diagnosed on several occasions with
radiculopathy in the right lower extremity.  The failure of the
administrative law judge to find that condition as a medically
determinable impairment, or to give an adequate explanation for
discounting it, makes his decisions at steps two and four of the
sequential evaluation process defective.[28]

The error at step two of the sequential evaluation
process draws into question the administrative law judge's residual
functional capacity determination and assessment of the credibility
of Hughes.  The administrative law judge found that Hughes's
medically determinable impairments could reasonably cause Hughes's
alleged symptoms but that Hughes's statements concerning the
intensity, persistence and limiting effects of those symptoms were
not credible.  This determination by the administrative law judge
was based on an incomplete and faulty analysis of all of Hughes's

---

28.  The record also reveals that Dr. Companion concluded that
Hughes suffered from peripheral vascular disease/neuropathy.

medically determinable impairments. The error at step two is a
sufficient basis to remand this case to the Commissioner for
further proceedings. However, there are several other errors that
support such a remand.

There are significant problems with the administrative
law judge's residual functional capacity assessment.  The most
serious being that the evidence that the administrative law judge
claims he relied on does not support his finding.  The
administrative law judge claims that he gave weight to Dr.
Companion's assessment but failed to explain why he did not
incorporate a sit/stand option into his residual functional
capacity determination.  The administrative law judge claims that
he gave great weight to the functional assessment of Dr. Murray,
including Dr. Murray's postural limitations. Tr. 16.  However, the
administrative law judge found that Hughes could perform occasional
balancing, stooping, kneeling and crouching.  This finding is
contrary to Dr. Murray's assessment that Hughes could never
balance, stoop, kneel, crouch or bend. Tr. 430.  According to
Social Security Ruling 85-15 some stooping "is required to do
almost any kind of work . . . ."  The complete prohibition on
performing stooping, balancing, kneeling, crouching, and bending
and the need for a sit/stand option was not properly taken into
account by the administrative law judge - or the vocational expert
- consequently the determination at step five of the sequential

evaluation process is defective and not supported by substantial evidence.

Another defect in the administrative law judge's decision occurred at step three of the sequential evaluation process. The administrative law judge in his analysis at step three found that Hughes had moderate difficulties in concentration, persistence or pace. When presenting a hypothetical question to the vocational expert, the administrative law judge did not include that limitation in the question.

Hughes argues that the failure to include that limitation – a moderate limitation in concentration, persistence or pace – in the hypothetical question is an error warranting remand for a new hearing. We find substantial merit in that argument.

Cases from this circuit and other circuits support Hughes's position. The Court of Appeals for the Third has held that if an administrative law judge poses a hypothetical question to a vocational expert that fails to reflect all of the applicant's impairments that are supported by the record, the vocational expert's opinion cannot be considered substantial evidence. Ramirez v. Barnhart, 373 F.3d 546, 552-553 (3d Cir. 2004); see also Corona v. Barnhart, 431 F.Supp.2d 506, 516 (E.D.Pa. 2006)("the ALJ's determination that Plaintiff suffers mild restrictions in activities of daily living, moderate

31

difficulties in maintaining social functioning and moderate
difficulties in maintaining concentration is not properly
reflected in her hypothetical question to the VE."); <u>Warfle v.
Astrue</u>, Civil No. 10-1255, slip op. at 20 (M.D. Pa. May 5,
2011)(Muir, J.)("It is incumbent on the administrative law judge
to include in a hypothetical question all the limitations that are
supported by the records."); <u>Little v. Astrue</u>, Civil No. 10-1626,
slip op. at 18-19 (M.D.Pa. September 14, 2011)(Kosik, J.).

     Although the administrative law judge limited Hughes to
unskilled work, this does not adequately reflect a limitation in
concentration, persistence or pace. <u>Id.</u>[29]  There are clearly many
unskilled jobs that require an employee to maintain concentration,
persistence and pace.  There is no evidence in the record from a
vocational expert that a moderate limitation in those areas would
not impact Hughes' ability to maintain employment as a cashier,
packer or tagger.  We can only speculate as to what the erosion
would have been if a moderate limitation in concentration,
persistence or pace would have been included in the hypothetical
question.[30]

_____

29.  <u>See also</u> <u>O'Connor-Spinner v. Astrue</u>, __F.3d__, No. 09-4083
(7th Cir. Nov. 29, 2010)("[T]he ability to stick with a given
task over a sustained period is not the same as the ability to
learn how to do task of a given complexity.").

30.  It is also important to mention that at step five of the
sequential evaluation process the burden is on the Commissioner
                                                (continued...)

Hughes's final argument is that the administrative law judge did not appropriately consider the opinions of Dr. Szulawski or the subjective complaints of Hughes. These arguments have merit in light of the issues we raised in footnotes 13, 22 and 23. Furthermore, in rejecting the subjective complaints of Hughes, the administrative law judge stated in his decision of January 25, 2010, as follows:

> In this case, the claimant's case in establishing disability is directly dependent on the element of pain which is of an intractable nature. Pain is subjective and difficult to evaluate, both quantitatively and qualitatively. Nevertheless, most organic diseases produce manifestations other than pain and it is possible to evaluate the underlying processes and degree of resultant impairment by considering all of the symptoms. Generally, when an individual has suffered pain over an extended period, there will be observable signs such as a significant loss of weight, **an altered gait** or **limitation of motion**, local morbid changes, or poor coloring of station. In the present case, the claimant has complained of pain over an extended period of time. **None of the above signs of chronic pain are evident.** While not conclusory by itself, this factor contributes to the determination that the claimant is not disabled as a result of pain.

Tr. 17 (emphasis added). Our review of the record reveals that on several occasions Hughes had medical appointments where he exhibited an altered gait and limitation of motion.

---

30. (...continued)
to produce evidence demonstrating that other work exists in significant numbers in the national economy that the applicant can perform. 20 C.F.R. §§ 416.912 and 416.960©.

The administrative law judge's assertion that Hughes did not exhibit an altered gait or limitation of motion was clearly erroneous.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.


_____
United States District Judge


Dated: March 12, 2012


34